## THE CITY OF CORSICANA v. R. N. WHITE

SUPREME COURT, AUSTIN TERM, 1882.

*Cities and towns.— Dedication of streets.— Deed referring to a recorded map of lots and streets.— Obstruction of street.— Injunction.— Liability of city for wrongs committed by marshal or mayor.—* A homestead adjoining a city, and so lying that extensions of A and B streets would bound it on two sides, was mapped by the owner into lots fronting upon extensions of A and B streets, such extensions being marked upon the map as parts, respectively, of said streets. Many of said lots having been sold and conveyed by deeds referring to said map for identification, the owner also sold and conveyed the lot upon the corner formed by the intersection of B street extension with the street separating the lot from the city.

The deed conveying the lot, after reciting the length of frontage upon both said street and B street extension, recited as follows: "Said lot being a part

5E

of the homestead which, for the purpose of sale, was cut up into lots and numbered as hereinbefore mentioned, as shown upon a map dividing said land, as appears of record, which map is made a part hereof for full indentity."

The vendor never having recorded said map, and having obstructed said B street extension by erecting a fence across it, he was arrested by the city marshal, fined by the mayor, and the fence removed by the marshal under an order of the mayor, whereupon he brought suit against the city for damages for the action of the marshal and mayor, and to enjoin the city from exercising control over the B street extension.

*Held*, On exception to the petition, the record not showing the powers and duties of such officers, that the city was not liable for their said acts.

*Held*, Also, the record showing that the plaintiff was willing that such extension should be used as a public street, upon being compensated by the city, which it had refused to do, that there is no case for an injunction.

*Same—Evidence—Parol statements contradicting recitals in deed—Estoppel.*— It was error, in such case, to permit the plaintiff to give evidence of verbal statements by him, made to the purchaser of said lot, and to others, that such extension should not be opened as a public street unless the city would compensate him for the same.

Error from Navarro county—Simkins & Simkins for plaintiff in error.  Wm. Croft for defendant in error.

This was an application for injunction by appellee against appellant, filed March 5, 1874, to restrain the city authorities from exercising control over a certain street, and to recover damages for certain alleged wrongs inflicted upon plaintiff by said authorities in the enforcement of their supposed jurisdiction.  The following statement from appellant's brief will explain the case:

The controversy in this case is over a small strip of land 70x300 feet, the natural extension of Bois d'Arc street, in the limits of the city of Corsicana.  Appellee claims the strip as a part of his homestead; the city claims it as a part of Bois d'Arc street, by virtue of a dedication of the premises by the said R. N. White.

In 1871 the H. & T. C. R. R. established a depot at Corsicana near and east of appellee's homestead, which then consisted of five acres, and worth about $350; the company opened a street running north and south, called Beaton street, which divided White's land from their own.  Bois d'Arc street was the next parallel street, and if extended, would have been the western boundary line of White's homestead, as will be seen by reference to map.  One Alex. Beaton owned the land lying between Beaton and Bois d'Arc street, that was immediately north of White's homestead.  On the establishment of the depot and opening of Beaton street, it immediately became the business thoroughfare of the city, and the lots lying on both sides

instantly became of great value. Beaton and White, who owned all the land lying on the west side of Beaton street, at once perceived that the eastern half of their land would be in great demand as business lots, and the western or rear part of their land would, of course, be demanded as residence lots. So they jointly employed one D. T. Iglehart to lay out their homesteads in blocks and lots, and to make a map of the same.

Some time in July, 1871, Iglehart mapped off the premises, dividing the White and Beaton land lying between Beaton and Bois d'Arc streets into four blocks, numbering them, as shown by the map, as follows: Beaton's land divided into blocks 1 and 2, and White's land into blocks 3 and 4. The business lots along the whole line of Beaton street were numbered from 1 to 48, consecutively, on said map. The rear portions were partly laid off in residence lots, and Bois d'Arc was projected along the west of blocks 3 and 4. After this division, both Beaton and White placed all their lands on the market and rapidly sold their lots at immense prices in gold, and in all their deeds (some eight or ten of which are shown in statement of facts), they sold by the numbers on the Iglehart map, acknowledging the map was duly recorded, " making it a part of the deed for identity," and " that the homestead was cut up into lots and blocks for the purpose of sale." Beaton, in his testimony, and White himself, state, on oath, " that they both sold by this map of Iglehart's, and it was the only map that was made." Consequently it is the map referred to in the deeds.

On the twenty-first of October, 1871, after the map was drawn and many lots sold thereby, F. W. Carruthers arrived in Corsicana and applied to R. N. White for a residence lot, who offered to Carruthers " the entire bunch of lots then unsold," as he had previously done to others. Carruthers finally purchased lots 6 and 7, twenty-five feet each, in block 3, lying at the intersection of White and Bois d'Arc streets, and paid White two hundred and sixty-six gold dollars for them, as being corner lots, and therefore more valuable, and received a deed from R. N. White, which speaks for itself. We call special attention to the recitals of this deed, to-wit:

" Lots 6 and 7, block 3, fronting fifty feet on White street, and running back one hundred feet on Bois d'Arc street. Said lots, being a part of the homestead which, for the purposes of sale, was cut up into blocks and lots and numbered as hereinbefore men-

tioned, as shown upon a map dividing said land, as appears of record, which map is made a part hereof for full identity."

This was duly recorded.

The object of Carruther's purchase was to get a corner lot, and White and himself carefully marked the lots by the line of Bois d'Arc street on the ground, and the deed recites the fact of its being there. After the purchase of the lots Carruthers was absent some two months, aud on his return he found a small house erected by Mrs. Block on the space of ground now in controversy, which partly blocked up the street next to him; that he at once demanded the reason of White why he thus blocked up the street, who admitted that he had rented a small lot to Mrs. Block, but he would always leave a wagon or carriage way open. White also erected a cow pen back of this house, on the same side of the street. This house was moved away in 1872, but there was always was a wagon way at all times open, which was in use in Carruthers and the public. It was further proved that the place purchased by Carruthers was the extreme limit of the town, and it was not until 1873, when the town expanded, that the street came into constant public use. White, in the fall of 1871, demanded pay for the street from the city council, who declined, because (as they then explained to him) the charter of May, 1871, gave them no authority to open or pay for streets, and that the city did not then claim or need this street. About October, 1873, all obstructions were removed from the street until March, 1874, when White ran a fence across the street and forbid the public from using the street. The street had become very important to public travel, and the city council ordered him to remove it, and upon his refusal, the marshal of the town, under order of the mayor, tore down the fence, and White, again-endeavoring to appropriate the premises, he was arrested upon the affidavit of F. W. Carruthers, for obstructing a public street; and after a jury trial before the mayor he was convicted of the offense and fined ten dollars, from which judgment he appealed; and pending the appeal, filed his petition in this cause against the city of Corsicana for an injunction, damages and general relief. The city answering, admitted that they held possession of the premises as a public street, and claimed that they held possession by virtue of a dedication, as evidenced by the various deeds of White himself, and their recitals; by the delineation of the prolongation of Bois d'Arc street on the Iglehart map, declared in the deeds to be duly recorded; by the street having been

expressly called for as an open street in the Carruther's deed; and because, lastly, R. N. White had given to Cyrus White, his son, shortly after the sale to Carruthers, the corner lot on block 4, lying on Bois d'Arc street, as shown upon the map, thus showing he recognized it as an open street.

At the trial of the cause all of the foregoing facts were duly plead in defendant's answer and proved. But the plaintiff, without amending his petition or pleading, proved, by his testimony, in confession and avoidance of these facts, over the objections of defendant, that " true he had sold lots to Carruthers and had employed Iglehart " as stated, but he said that " the Iglehart map is not, and never was, of record, though so stated in his deeds; that he never saw it or sold by it;" " that he sold Carruthers corner lots, " but at the time of the sale told him Bois d'Arc street would not be opened through his land unless the city paid him for the land;" that " he thought the city would soon condemn the street, but in the meantime he would always leave a wagon way open;" that " he did not know the Carruthers deed called for Bois d'Arc street;" " didn't remember reading the deed;" " that his son wrote it;" " that he had previously and subsequently tried to sell the street to the city, but the council refused to buy, because the charter gave them noauthority to do so." He was further allowed to prove, over the objections of defendant, by his son, Cyrus White, that he " heard his father tell Carruthers that Bois d'Arc would be a street when the city paid for it;" " that he had written the Carruthers deed, describing lots ' one hundred feet on Bois d'Arc,' under the directions and instructions of his father; that his father gave him a corner lot on Bois d'Arc street, on corner of Bois d'Arc and Collin street, shortly after the sale to Carruthers, but told him not to call for Bois d'Arc street in his deed."

He was then allowed, over defendant's objections to prove by J. M. Riggs, James Pigg and others that, in 1872 and subsequently, they heard R. N. White declare to other parties, and to themselves, that Bois d' Arc would not be opened until the city paid him for it; that he intended the land for a street, and would not sell it to any one, but that he intended to have pay for it.

The city then proved by Carruthers that he contracted for and purchased a corner lot from R. N. White; that corner lots are more valuable for inner lots, as residence lots, on account of their being more accessible and convenient; and he paid a high price on that account, although he had the choice of any other in the entire block

unsold; that White did not tell him the street was not and would not be an open street unless paid for by the city; that he would not have touched it on such terms; that it was all open when he bought it, and they both sighted through the weeds along Bois d'Arc street, so as to get his lot exactly upon the corner. His whole object was to get a corner lot, and he paid White the money without dreaming of any rights being reserved.

At the conclusion of the testimony, defendants filed a demurrer to the testimony, on the ground that the injunction being dissolved, and no damages proven, the court had no jurisdiction, which was overruled by the court and the cause submitted, without argument, to the jury, and they returned the verdict, "we find for plaintiff." No damages were assessed or injunction perpetuated, but, with a vague idea of the omnific power and capacity of a prayer for general relief, plaintiff enters a judgment suitable to an action of forcible entry and detainer, which defendant has assigned as error.

Opinion by Delaney, J.—One difficulty which we encounter in the decision of this case is that the record does not inform us of the powers and duties of the officers of the city of Corsicana; and another is that the allegations of the petition are so vague that it is not easy to determine precisely what was the object of the suit.

Among the allegations of damage to plaintiff, by far the most important, apparently, are his arrest and imprisonment, and the extortion of money from him by the persons whom he calls the mayor and marshal of the city.

These things are alleged to have been done wantonly, wickedly, and without authority. He adds also, that they wantonly and wickedly pulled down his fence and let the cattle into his garden, and he lays his damage at a thousand dollars. In estimating this damage, it is hardly probable that he passed by the wrongs done his person, and thought only of the trespass upon his fence and garden.

At all events, this part of the petition was had upon general demurrer. For if the mayor and marshal did these things lawfully, plaintiff has suffered no wrong. If they did them without authority, they may have made themselves personally liable for the trespass, but there is no cause of action against the city. (Harrison v. Columbus, 44 Texas, 418.)

Besides the prayer for damages, there was no other than the prayer for the perpetuation of the injunction. The injunction was

properly dissolved. The whole case shows that there was no ground for equitable interference. The plaintiff was entirely willing for the land to be made a public street. He simply desired pay for it. Without some amendment of the pleadings, it seems to us that the court, should, upon dissolution of the injunction, have dismissed the petition.

This is sufficient to dispose of the case, but as the court below proceeded with the trial, and several other of the rulings are assigned as error, perhaps we shall notice them. And we think the court erred in permitting plaintiff to testify to declarations made at the time when he sold the lots to Carruthers. The deed, though made to Carruthers, speaks to all men, and all persons into whose hands that property may come can enforce against the maker the covenant in the deed. He is perpetually estopped to deny it. So the declarations said to have been made by him to other parties on the same subject should have been excluded. But besides the deed to Carruthers, the testimony shows that plaintiff had sold a number of lots, which had been laid off and mapped, and he refers to this map in his deeds. Upon that map the land about which he is endeavoring to litigate is laid down as one of the streets his proposed addition to the city.

Now, if a suit, or suits, were brought against him by some of these purchasers to compel him to open this street, would it be possible for him to resist such a suit ? That is not an open question in our courts. (Oswald v. Grenet, 22 Texas, 94; Preston v. Navasota, 34 Texas, 684; Lamar County v. Clements, 49 Texas, 347.)

If the corporate limits of the city had been extended so as to include these lots and blocks, the city authorities would probably have the right to open the streets. We say probably, because that is a power which generally belongs to city governments. The record is silent on the subject. It does not inform us what were the powers of the city council. But the whole case proceeds upon the supposition that if the land in dispute had become a public street by dedication, the city council had the right to open it to the public.

We conclude that there is error in the record, for which the judgment should be reversed and the cause remanded.

Report of Commissioners of Appeals examined, their opinion adopted, judgment reversed and the cause remanded.—GOULD, C. J.